**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DONALD R. STANBRO,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | )    **C.A. 05-248 Erie** |
| | ) |
| **JO ANNE B. BARNHART,** | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

## OPINION

This case is before us on appeal from a final decision by the defendant, Commissioner of

Social Security ("the Commissioner"), denying Donald R. Stanbro's claim for disability

insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and Title

XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The parties have

submitted cross-motions for summary judgment. For the reasons stated below, the Plaintiff's

motion for summary judgment is granted and this matter is remanded to the Commissioner for an

award of benefits. The Defendant's motion for summary judgment is denied.

### I. Background

#### A. Procedural Background

Mr. Stanbro applied for disability insurance benefits and for supplemental security

income on April 21, 2003, alleging disability based on a back impairment. His application was

initially denied, and Mr. Stanbro requested a hearing before an Administrative Law Judge. Mr.

Stanbro, represented by counsel, appeared and testified at an administrative hearing before

Administrative Law Judge ("ALJ") James J. Pileggi on May 19, 2004. (R. at 189-208.) A

vocational expert also testified at the hearing. On July 7, 2004, the ALJ issued his decision

denying disability benefits and supplemental security income and finding that Mr. Stanbro was

not disabled. (R. at 19-26.)

The Appeals Council denied Mr. Stanbro's request for review on September 19, 2004. (R. at 15-17.) Mr. Stanbro sought further review before the Appeals Council because the Appeals Council issued its decision without producing a copy of the record and without permitting legal argument. (R. at 10-11.) However, in order to preserve his appeal, Mr. Stanbro also filed an action in this Court on November 12, 2004, filed at civil action number 04-330 Erie.

Meanwhile, the Appeals Council re-opened the case and provided the record to counsel. (R. at 5-9A.) While the Appeals Council considered Mr. Stanbro's case, he filed a motion to withdraw his complaint filed in federal court and his complaint was dismissed without prejudice. (R. at 209.)

On July 1, 2005, the Appeals Council reversed its September 19, 2004 decision, reviewed the legal argument, and again denied Mr. Stanbro's request for review thereby making the ALJ's decision the final decision of the Commissioner. (R. at 211-215.) Mr. Stanbro then filed the present action seeking judicial review of the ALJ's decision.

## B. Factual Background

Mr. Stanbro was born on June 17, 1958. He completed the 11th grade and he has obtained his GED. He has past work experience as an office manager, building maintenance man, milker, and brake operator.

On December 4, 1998, Mr. Stanbro was working maintenance at an apartment complex ripping up tiles and changing them when he experienced back pain and leg pain. (R. at 93.) He continued to work the rest of the day, and he went to work on December 5, 1998, but he eventually became unable to move. (R. at 93.) With the assistance of his son he was taken to Union City Memorial Hospital, where he was admitted for his severe pain. (R. at 90-99.) After he was discharged he continued to receive physical therapy through Union City Memorial Hospital from December, 1998 through August, 1999. (R. at 100-116.) The final physical therapy progress note from August 24, 1999, indicates that Mr. Stanbro had an underlying spinal pathology. (R. at 100.) As a result, the physical therapist noted that Mr. Stanbro was not

2

meeting his physical therapy goals, was progressing poorly, and concluded that Mr. Stanbro would not benefit from continued physical therapy. (R. at 100.)

Prior to the final physical therapy progress note, Mr. Stanbro began treatment with Joseph M. Thomas, M.D. on August 9, 1999. (R. at 154-155.) He continued treating with Dr. Thomas throughout the time period leading up to the disability hearing on May 19, 2004. (R. at 128-155; 173-180.) In addition, the evidence also includes medical records from the Erie Medical Specialty Clinic, dated from October 23, 2000 through February 18, 2003, consisting of radiology reports of Mr. Stanbro's numerous MRI's. (R. at 118-126.)

A consultative examination was performed by the state agency physician, Alexandra M. Hope, M.D., on July 22, 2003. (R. at 156-162.) Dr. Hope completed a Medical Source Statement and attached a Range of Motion Chart. (R. at 159-160, 161-162.) The vocational expert testified that based on Dr. Hope's report of Mr. Stanbro's limitations, Mr. Stanbro could not sustain work at the sedentary level as set forth by the ALJ. (R. at 205-206 (testimony of vocational expert); R. at 159-160.)

A state agency physician also completed a physical residual functional capacity assessment, however, this evidence was not considered by the ALJ because of an inability to identify the physician since the signature was not legible and the medical consultant code was not completed. (See R. at 191-192 (ALJ's ruling on evidence), and R. at 163-170 (RFC form).)

## II. Standard of Review

The standard of review in social security cases is whether substantial evidence exists in the record to support the Commissioner's decision. Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir.2000). "Substantial evidence has been defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir.1999) (quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir.1995)). Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently. Fargnoli, 247 F.3d at 38; 42 U.S.C. § 405(g).

"Under the Social Security Act, a disability is established where the claimant

demonstrates that there is some 'medically determinable basis for an impairment that prevents

him from engaging in any 'substantial gainful activity' for a statutory twelve-month period.'"

Fargnoli, 247 F.3d at 38-39 (quoting Plummer, 186 F.3d at 427 (other citation omitted)); see also

20 C.F.R. § 404.1505(a). "A claimant is considered unable to engage in any substantial gainful

activity 'only if his physical or mental impairment or impairments are of such severity that he is

not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national

economy . . . .'" Fargnoli, 247 F.3d at 39 (quoting 42 U.S.C. § 423(d)(2)(A)).

The Commissioner has provided the ALJ with a five-step sequential evaluation process to

be used when making this disability determination. See 20 C.F.R. § 404.1520. The United

States Court of Appeals sets forth the five-step procedure as follows:

> In step one, the Commissioner must determine whether the claimant is currently engaging
> in substantial gainful activity. 20 C.F.R. § [404.] 1520(a). . . . In step two, the
> Commissioner must determine whether the claimant is suffering from a severe
> impairment. 20 C.F.R. § 404.1520(c). . . . In step three, the Commissioner compares the
> medical evidence of the claimant's impairment to a list of impairments presumed severe
> enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not
> suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and
> five. Step four requires the ALJ to consider whether the claimant retains the residual
> functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The
> claimant bears the burden of demonstrating an inability to return to her past relevant
> work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir.1994). If the claimant is unable to
> resume her former occupation, the evaluation moves to the final step. At this stage, the
> burden of production shifts to the Commissioner, who must demonstrate the claimant is
> capable of performing other available work in order to deny a claim of disability. 20
> C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant
> numbers in the national economy which the claimant can perform, consistent with her
> medical impairments, age, education, past work experience, and residual functional
> capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in
> determining whether she is capable of performing work and is not disabled*See* 20
> C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at this
> fifth step. *See,* [sic] Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir.1984).

Fargnoli, 247 F.3d at 39 (quoting Plummer, 186 F.3d at 428).

The claimant carries the initial burden of demonstrating by medical evidence that he is

unable to return to his previous employment due to a medically determinable impairment.

Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Once the claimant meets this

burden, steps one through four described supra, the burden of proof shifts to the Commissioner to show that the claimant can engage in alternative substantial gainful activity. Id.

## III. ALJ's Decision

The ALJ found that based on Mr. Stanbro's age, education, and work experience, and his residual functional capacity that Mr. Stanbro is "not disabled." (R. at 24.) In particular, the ALJ found that Mr. Stanbro retains the residual functional capacity to perform sedentary work that affords a sit/stand option, does not require repetitive use of foot controls, and does not require repetitive bending or bending at the waist to 90 degrees. (R. at 23, 24.)

The ALJ undertook the five-step sequential evaluation in determining that Mr. Stanbro was not disabled. The ALJ made the following findings:

(1) that Mr. Stanbro had not engaged in substantial gainful activity since January 27, 2003;

(2) that Mr. Stanbro suffers from degenerative disc disease at L3-4 and L4-5, which is severe;

(3) his impairments, although severe, do not meet or equal the criteria of the Listing of Impairments set forth in 20 C.F.R. Pt. 404, SubPart P, Appendix 1, Regulations No. 4;

(4) he retains the residual functional capacity for sedentary work that affords a sit/stand option, does not require repetitive use of foot controls, and does not require bending at the waist to 90 degrees; and

(5) using Medical-Vocational Rule 201.21 or 201.22 as a framework for decision-making, there are a significant number of sedentary jobs with the above limitations in the national economy that Mr. Stanbro could perform, such as an assembler, lamp shade assembler, or surveillance systems monitor.

(R. at 25.)

The ALJ also found that Mr. Stanbro's "allegations regarding his limitations are not totally credible for the reasons set forth in the body of the opinion." (R. at 25.) In addition, the ALJ found that Dr. Hope's report of Mr. Stanbro's functional limitations to be "inconsistent and unsupported by the evidence of record," specifically noting that "claimant's L4-5 complaints are **mild**." (R. at 23, citing Dr. Thomas' medical records dated 5/21/03 to 4/14/04, r. at 173-180 (emphasis in original).)

5

## IV. The Parties' Arguments

Mr. Stanbro argues that the ALJ's decision is not supported by substantial evidence. He argues that the ALJ failed to give adequate weight to both his treating physician's medical evidence and the consulting examining physician's report. He also argues that the ALJ failed to cite to record medical evidence to support his decision to disregard the medical evidence from Dr. Thomas and Dr. Hope. Mr. Stanbro also argues that there is no medical evidence that contradicts these medical sources. In addition, he also argues that the ALJ did not properly consider his subjective complaints of pain that are supported by the record evidence. Finally, Mr. Stanbro argues that the ALJ erred in failing to adequately account for all of his impairments in determining Mr. Stanbro's residual functional capacity.

Because it is not lengthy, we reproduce the relevant portion of the ALJ's opinion, in which he discusses his critical determinations in this case. After reciting the five-step sequential evaluation, the ALJ stated as follows:

The claimant has not engag[ed] in substantial gainful activity at any time since the alleged onset date. He has severe impairments but has not been shown to meet or equal any listed impairment.

The record shows the claimant has complained of back pain for some time. Relevant medical evidence for the alleged time period begins with an MRI revealing degenerative narrowing of the 2nd through 5th lumbar discs, degenerative facet joint changes and bulging at L2-3, L3-4, L4-5 and L5-S1 (Exhibit 3F [Erie Medical Specialty Clinic medical records from 10/23/00 tp 2/18/03, r. at 117-126]).

Treatment notes from Dr. Thomas (for the relevant time period) indicate the claimant complained of waxing and waning low back pain with a diagnosis of symptomatic L4-5 protrusion/herniation with direct L5 root compression (Exhibit 4F [Dr. Thomas' Progress Notes from 8/99/99 to 3/17/03]).

At the time of a July 2003 evaluation the claimant reported dull low back pain and tingling and numbness in his lower extremities. A physical examination revealed tenderness in the lumbosacral region, decreased sensation in the left lower extremity and a slow/stiff gait. He was diagnosed with lumbar and degenerative changes and chronic low back pain (Exhibit 5F [Dr. Hope's consultative examination report dated 7/22/03]).

The undersigned finds based on the [consultative] examination the functional limitations listed (occasionally lifting 2-3 pounds, limited use of lower extremities, inability to bend, kneel, stoop, crouch, balance or climb) are inconsistent and unsupported by the evidence of record (Exhibit 5F). Including

6

Exhibit 8F [Dr. Thomas' Progress Notes from 5/21/03 to 4/14/04,] which
indicates the claimant's L4-5 complaints are **mild**.

It is clear the claimant experiences back pain secondary to degenerative disc
disease. However, the undersigned finds that he is not as limited as his testimony
would indicate. The record shows he is independent **with all activities including
driving**. He is able to play with his 11 year old daughter, 2 year old
granddaughter and two 8 month old foster children. Further, he shops, dresses,
showers, and pulls the trash can to the street (Exhibit 5F).

There is no supporting evidence indicating that the claimant **requires** a cane to
ambulate and that he is unable to drive. Although he experiences pain when
sitting and standing for prolonged period, a sit/stand option should alleviate his
symptoms. He has never reported to his doctors that his pain medication is
ineffective and the only procedure he has undergone are injections (no surgery
has been recommended). There is no physical examination supporting the
claimant's alleged limitations (inability to stand for more than 5 minutes, sit for
more than 20 minutes., lift no more than a can of coffee).

Therefore, **he is capable of sedentary work that affords a sit/stand option and
does not require repetitive bending or bending at the waist to 90 degrees.**

(R. at 23 (emphasis in original).)

As can be seen, the ALJ's opinion does not offer an extensive discussion of the evidence.

The Commissioner expands on the ALJ's opinion by arguing that substantial evidence does

support the ALJ's decision, that the ALJ did consider and properly evaluate the medical

evidence as well as Mr. Stanbro's complaints of pain, and that the ALJ's residual functional

capacity determination was proper. The Commissioner largely relies on the same evidence to

support of each argument. Extracted from the arguments, the record evidence cited by the

Commissioner in support of the ALJ's decision consists primarily of the following:

(i) Generally, Dr. Thomas' Progress Notes (R. at 128-154, 173-180), but
specifically, the Commissioner relies on five of Dr. Thomas' Progress Notes
dated February 14, 2003, March 17, 2003, May 21, 2003, June 4, 2003, & April
14, 2003 (R. at 128-129; 173: & 179-180);

(ii) Dr. Hope's Report dated July 22, 2003 (R. at 156 & 157);

(iii) the Disability Report completed by Mr. Stanbro on April 14, 2003 (R. at 58);
and

(iv) Mr. Stanbro's Report of Daily activities dated May 10, 2003 (R. at 78-79).

The Commissioner cited the following additional record evidence: Mr. Stanbro had epidural

injections in September 2003, November 2003, December 2003, and February 2004; and he had

an excellent response to the injection in September 2003; and he had excellent relief after the December 2003 injection. (R. at 174-177.) The Commissioner also specifically cites Dr. Thomas' Progress Notes dated September 24, 2003 as showing that Mr. Stanbro was improving, that he had "fair lumbar range of motion," and that he tolerated the epidural injection procedural extremely well. (R. at 177.)

## V. Analysis

Mr. Stanbro argues that the ALJ erred in failing to provide any reasons for rejecting the medical evidence of his treating doctor and of the consulting examining doctor, which indicate that Mr. Stanbro suffers a severe impairment with disabling limitations. Specifically, he argues that the ALJ failed to cite to any medical evidence of record to support his rejection of the limitations set forth by Dr. Hope. Mr. Stanbro also argues that the ALJ offers no indication as to how much weight he gave Dr. Thomas' medical opinion and did not cite any medical evidence that contradicts Dr. Thomas' opinions. Consequently, Mr. Stanbro argues that the ALJ must have substituted his own lay opinion when he disregarded the medical evidence.

"Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." Fargnoli, 247 F.3d at 43 (citing 20 C.F.R. § 404.1527(d)(2); and Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)). An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided. Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985). To the extent that a non-treating source provides supporting explanations that are consistent with the other substantial evidence in the case, such opinions from non-treating sources are entitled to more weight. 20 C.F.R. §§ 404.1527(d), 416.927(d). An ALJ may not make speculative inferences from medical reports and is not free to employ his own expertise against that of a physician who presents competent medical evidence. Fargnoli, 247 F.3d at 37. When a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." Mason v. Shalala, 994 F.2d

8

1058, 1066 (3d Cir. 1993). The ALJ must consider all the evidence and give some reason for discounting the evidence he rejects. Stewart v. Secretary of H.E.W., 714 F.2d 287, 290 (3d Cir. 1983).

The critical decision made by the ALJ regarding the medical evidence was his rejection of the limitations set forth by the state agency physician, Alexandra Hope, M.D. The ALJ did not reject any other portion of Dr. Hope's report, nor did he reject any of the other medical evidence provided by Dr. Thomas, the Union City Memorial Hospital, the physical therapy unit, or the Erie Medical Specialty Clinic. The ALJ's sole citation to medical evidence contradicting Dr. Hope's opinion is that Dr. Thomas referred to Mr. Stanbro's complaints of pain as "mild" three times over the course of his treatment. Otherwise, the ALJ points to no conflict in the medical evidence.

The remainder of the opinion consists simply of a rejection of Mr. Stanbro's testimony regarding his alleged limitations. In support of this rejection the ALJ cites to Dr. Hope's report wherein she recounted Mr. Stanbro's daily activities, and notes other daily activities reported by Mr. Stanbro in his Disability Report and/or his Daily Activities report. However, Mr. Stanbro's testimony regarding his limitations is not in dispute. Mr. Stanbro does not challenge the ALJ's credibility finding. Instead, he argues that the ALJ failed to properly consider Mr. Stanbro's subjective complaints of pain insofar as all of the medical evidence supports his corresponding limitations as reported by Dr. Hope. Thus, we can reject Mr. Stanbro's hearing testimony that he requires a cane to ambulate, is unable to drive, that is unable to stand for more than 5 minutes, unable to sit for more than 15 minutes, and is unable to lift more than a can of coffee. But his testimony is irrelevant as to whether the record evidence supports his limitations as reported by Dr. Hope, as the two are not equivalent.

Given the brevity of the opinion and the lack of discussion of the relevant record evidence it is difficult for a reviewing Court to reach any conclusion but that the ALJ did not thoroughly evaluate and weigh the medical evidence. Our discussion of the arguments and evidence cited in support of the ALJ's opinion does not change this conclusion.

9

## A. Evidence and Arguments in Support of the ALJ's Decision

The Commissioner argues that the evidence shows that:

(1) Mr. Stanbro has only "mild" complaints, citing Dr. Thomas' Progress Notes dated May 21 and June 4, 2003 and April, 14, 2004 (R. at 173, 178-179).

(2) Mr. Stanbro was able to perform a wide range of activities, citing Mr. Stanbro's Report of Daily activities dated May 10, 2003 (R. at 78-79) and Dr. Hope's Report dated July 22, 2003 (R. at 156);

(3) Mr. Stanbro was able to work with his injury and he stopped working only after he was "let go" from his job, citing the Disability Report completed by Mr. Stanbro on April 14, 2003 (R. at 58) and Dr. Thomas' Progress Notes dated February 14 and March 17, 2003 (R. at 128-129); and

(4) Dr. Thomas indicated that Mr. Stanbro was able to perform light duty work, citing Dr. Thomas' Progress Notes dated February 14 and March 17, 2003 (R. at 128-129).

We address these arguments in turn.

### 1. Mr. Stanbro had only "Mild" Complaints

Both the ALJ and the Commissioner rely on Dr. Thomas' Progress Notes indicating that

Mr. Stanbro's L4-5 complaints are mild as medical evidence contradicting Dr. Hope's opinion.

However, we find that such evidence is not substantial evidence contradicting

Dr. Hope's opinion. A review of the relevant Progress Notes reveal the following.

Under the "OBJECTIVE" section of the Progress Notes are several "mild" references that are derived from objective measures, not from Mr. Stanbro's complaints. Thus, these references are not the ones relied upon by the ALJ. For example, on May 21, 2003, Dr. Thomas states "Earlier studies midline broad based protrusion, mild herniation at the L4-5 level." (R. at 180.) In the June 4, 2003 Note, Dr. Thomas similarly stated: "Earlier studies document a broad based protrusion, mild herniation at the L4-5 level with ligament hypertrophy and facet joint changes contributing to probable L5 impact centrally." (R. at 179.) The same or similar language referring to the objective tests that show a "mild herniation at L4-5" appears again in several other Progress Notes. (R. at 173-178.) In addition, on September 24, 2003, Dr. Thomas states "Extension to 10-15 degrees with mild weakness in gastrocnemius strength and dorsiflexion." (R. at 177.) Similarly, on December 23, 2003, Dr. Thomas noted "Mild weakness

10

of right gastrocnemius strength and dorsiflexion." (R. at 175.) Dr. Thomas again repeats the

same or similar language regarding "mild weakness" on February 17, 2004 and April 14, 2004.

(R. at 173-174.)

Next, Dr. Thomas refers to "mild" pain or "mild" complaints that arose during the course

of examinations. On March 17, 2003, in the context of examining Dr. Stanbro, Dr. Thomas

stated:

> Fair cervical motion. Good shoulder girdle and arm strength. **Mild** pain across
> the L4-5 level of the lumbar spine. He walks with a slow gait. He is able to flex
> slowly to 80 degrees. **Mild** increase in back pain and pain into the sacral area. . . .

(R. at 128 (emphasis added).) Similarly, but without using the term "mild," Dr. Thomas

reported on May 21, 2003 that Mr. Stanbro "is able to flex slowly to 80 degrees with increased

back and sacral discomfort." (R. at 180.) Again on September 24, 2003, Dr. Thomas notes that

"Flexion at 80 degrees increases back and right sacral pain." (R. at 177.) Reviewing these

references in context shows that when Dr. Thomas has Mr. Stanbro perform flexes, it increases

his already existing pain, and on March 17, 2003, that increase in pain was "mild."

This leaves three references to "mild" complaints relied upon by the ALJ and the

Commissioner, which are as follows. On November 18, 2003, under the "ASSESSMENT"

section, Dr. Thomas stated "1) Patient with some mild right L4-5 radiculopathy, improving after

last injection." (R. at 176.) On February 17, 2004, Dr. Thomas' assessment was "Patient with

mild left L5 radicular symptoms." (R. at 174.) Finally, on April 14, 2004, his

Assessment/Diagnosis" is "Patient with mild right L4-5 sensory complaints. Good response to

epidural injection." (R. at 173.)

We cannot say that the references to "mild" complaints constitute substantial medical

evidence sufficient to contradict Dr. Hope's opinion. "Radiculopathy" is a disease of the nerve

root and no one disputes that Mr. Stanbro does in fact have a severe impairment that causes him

pain. The references to Mr. Stanbro's "mild" radiculopathy are sporadic and occur in only three

progress notes over the course of over four years of treatment. Dr. Thomas refers to Mr.

Stanbros's radiculopathy in more and less detail in all of his Progress Notes, ranging from a

11

simple "patient with right L5 radiculopathy," in September and December 2003, r. at 177 & 175, to a more elaborate,

> Patient with symptomatic L4-5 *protrusion/herniation* with direct L5 root compression. Mild lateral recess encroachment at the level of the L4 roots.

r. at 128 (emphasis in original). Taken together these records indicate that Dr. Thomas always documented Mr. Stanbro's physical problems, but only sometimes did he characterize Mr. Stanbro's subjective level of pain or complaints. Also, his statements of "mild" radiculopathy begin in November with a reference to "right L4-5," then change to "left L4-5" in February, and back again to "right L4-5" in April. Without more information we cannot say that the three comments by Dr. Thomas, a doctor who treated Mr. Stanbro for over four years, contradict Dr. Hope's opinion regarding Mr. Stanbro's limitations.

## 2. Mr. Stanbro was able to Perform a Wide Range of Activities

We turn now to the ALJ and the Commissioner's argument that the record evidence shows that Mr. Stanbro is able to perform a wide range of activities. As noted, the ALJ stated that the evidence demonstrates that Mr. Stanbro is independent with all activities including driving; that he is able to play with his 11 year old daughter, 2 year old granddaughter and two 8 month old foster children; and that he shops, dresses, showers, and pulls the trash can to the street. (R. at 23, citing Dr. Hope's report at 156.) The Commissioner adds to the ALJ's list by noting that Mr. Stanbro can assist with meal preparation, dishes, laundry, and changing diapers; and he can carry grocery bags weighing up to 20 pounds. (Commissioner's Brief, at 8-9, citing R. at 78-79, 156.)

Dr. Hope's report is a summary of daily activities, apparently as reported by Mr. Stanbro. The report states:

> Mr. Stanbro is independent with all activities, including driving. He and his wife share the homemaking and shopping; she does the heavy work. His son does the yard work. He spends his time playing with the children in his home, who include an 11 year old daughter, 2 year old granddaughter, and two 8 months old foster children. Child care is provided by the patient, his wife, his son, and his 11 year old daughter.

12

(R. at 156.) This is all that Dr. Hope's records show regarding Mr. Stanbro's daily activities. In addition, to the items cited in the ALJ's opinion, Dr. Hope's report also reveals that Mr. Stanbro's wife "does the heavy work" when it comes to homemaking and shopping; his son does the yard work; and Mr. Stanbro is one of four people providing care to the children. The report says nothing about the manner in which Mr. Stanbro plays with the children, thus we do not know if he plays board games while seated or whether he is outside running and throwing balls with the children. While noting that Mr. Stanbro is able to independently drive, the report says nothing about whether he does drive or, if he does, how long he drives or what pain he experiences. In short, this is a very general and brief report that includes caveats showing that in fact Mr. Stanbro is not performing a wide range of activities. Thus, the ALJ and the Commissioner relied on this evidence only insofar as it supported their position, while leaving out the portions that contradict their position.

The Commissioner also relies on Mr. Stanbro's Report of Daily Activities completed on May 10, 2003, in which he stated that he helps with meals, dishes, laundry, and changing diapers. (R. at 78.) However, Mr. Stanbro also explained that if he did more than usual on a particular day he would suffer severe pain in the back, numbness in his legs, and falling down. (R. at 78.) He also reported that he cannot ride in a car more than 30 miles without his legs going numb. (R. at 79.) In addition, he reported that he cannot lift more than 20 pounds (explaining that he can lift a 20 pound bag of groceries out of the car) and his wife does the vacuuming. (R. at 78-79.)

Mr. Stanbro also reported that he takes out the trash, as noted by the ALJ, but the trash can is on wheels, a fact not noted by the ALJ. (R. at 79.) As of May 2003, Mr. Stanbro reported that he could mow the lawn with a self-powered mower, but that he must stop and rest due to back pain and numbness. (R. at 79, 81.) Moreover, at the time of the hearing, he testified that he no longer mowed the lawn, and his brother or his son mowed the lawn for him. (R. at 10, see also R. at 88-89 (letter from Mr. Stanbro's brother dated May 19, 2004).)

13

We fail to find that the above evidence shows that Mr. Stanbro is performing a "wide range of activities" that conflicts with Dr. Hope's opinion regarding Mr. Stanbro's limitations. If anything, this evidence supports Dr. Hope's opinion.

### 3. Mr. Stanbro was "let go" but remained capable of light duty work

The remaining two arguments were asserted only by the Commissioner and do not appear in the ALJ's opinion. The Commissioner argues that the ALJ's opinion is proper based on record evidence that shows that Mr. Stanbro did work while he was injured and that he was still capable of working after he was "let go." We find no evidence in the record to support the assertion that his employer let him go or eliminated his position even though Mr. Stanbro remained capable of doing his job.

Mr. Stanbro's last day of work was January 27, 2003. (R. at 58.) The evidence cited by the Commissioner shows that three weeks later, on February 14, 2003, Mr. Stanbro reported to Dr. Thomas that he was "let go from his employer." (R. at 129.) On March 17, 2003, Dr. Thomas stated that "recently [Mr. Stanbro's] job was essentially eliminated." (R. at 128.) On April 14, 2003, Mr. Stanbro reported on his Disability Report that he stopped working because he "was let go." (R. at 58.) A more complete examination of the record evidence, however, shows that the term "let go" is not equivalent to being laid off. In addition, the evidence shows that Mr. Stanbro performed heavy work for his employer as a maintenance man, and then after his injury he continued to work for the same employer only at a much reduced exertion level.

In his Disability Report, Mr. Stanbro noted that he did work after the date he was first injured and that his injury caused him to change his job duties. (R. at 58.) The state agency interviewer who conducted a teleclaim with Mr. Stanbro on April 14, 2003, noted,

CLAIMANT WAS INJURED AT WORK 12/98 BUT WENT BACK TO WORKING FOR THE SAME COMPANY, DOING A DIFFERENT JOB, FULL-TIME.

(R. at 69, Disability Report - Field Office form dated 4/22/03.) In his Work History Report, Mr. Stanbro explained the duties of the building maintenance job he held prior to his injury as "electrical, plumbing, drywalling, painting, mowing, shampooing carpets, floor care, wax

14

remov[a]l, furnace work, plowing, shoveling, roof repair, clean gutters, maintaining 50 [apartments]." (R. at 72.) He lifted and carried 50 pound salt bags 15 feet, a shampoo machine up three floors in 3 buildings and up two floors in two buildings, and a forty foot ladder to all buildings. (R. at 72.) The heaviest weight he carried was 75 pounds, and he frequently lifted 50 pounds or more. (R. at 72.)

In contrast, after his injury he continued to work for the same employer as an office manager. (R. at 71.) He reported that his duties were sitting at the computer, showing apartments, and taking applications. (R. at 71.) He stood 30 minutes, sat for six hours and walked for one hour. (R. at 71.) He lifted and carried totes weighing 50 pounds each 3 times a week from one room to the next room and back. (R. at 71.) The heaviest weight he carried was 50 pounds, and he frequently lifted less than 10 pounds. (R. at 71.)

The evidence shows that it was his inability to perform at the lower exertion level that caused his employer to "let go" Mr. Stanbro. Dr. Thomas' February 14, 2003 Progress Note states that "[Mr. Stanbro] tells me he has been let go from his employer," but Dr. Thomas also goes on to state that Mr. Stanbro's employer "had provided light duty for the last two years and now they tell him that he is not doing his job in light duty so they have replaced him with somebody." (R. at 129 (emphasis added).) Far from suggesting that Mr. Stanbro was able to work but was laid off, the above evidence shows that Mr. Stanbro was no longer capable of performing even the light duties of his position to the satisfaction of his employer and so his employer replaced him. The February 14, 2003 office visit was Mr. Stanbro's first opportunity to explain to Dr. Thomas that he was no longer working, and thus presumably is more accurate as the events were fresh in Mr. Stanbro's mind.

On March 17, 2003, over a month later, Dr. Thomas stated "The patient was injured in December of 1998, was provided modified duties for 2 years, and then recently his job was eliminated." (R. at 128.) With no explanation, Dr. Thomas's statement about Mr. Stanbro's job loss changed from Mr. Stanbro's employer replacing him because he was not doing his job, to the vague phrase "recently his job was eliminated." Perhaps Mr. Stanbro told Dr. Thomas that

15

he was wrong on February 14, 2003 when he said his employer replaced him because he could not do his light duties, and that in reality his employer just eliminated his position. An equally likely explanation is that Dr. Thomas used different language to mean that because Mr. Stanbro could no longer do his duties his job was eliminated simply because the reason was not clinically important. However, no one asked Dr. Thomas or Mr. Stanbro to further explain the circumstances of his job loss.

Complicating the matter further, on May 21, 2003, approximately four months after Mr. Stanbro stopped working, Dr. Thomas stated that "[Mr. Stanbro] was recently denied modified duties." (R. at 180.) This language suggests that Mr. Stanbro sought to modify his light duty work with his employer but his employer denied the request, which then lead to Mr. Stanbro losing his job. However, in his Recommendations Dr. Thomas also stated that Mr. Stanbro "was handling modified duties until his employer just discontinued the position." (R. at 180.) Without more explanation it is difficult to discern exactly what happened. Dr. Thomas does not mention Mr. Stanbro's job loss again. We find that this evidence does not show that Mr. Stanbro was "let go" but remained able to work.

### 4. Mr. Stanbro Had the Ability to Perform Light Duty Work

We note that there is no dispute that initially Mr. Stanbro's injury was so severe that his employer permitted him to dramatically change his job duties to light duty work. He continued in that position until January 27, 2003. While off work, Dr. Thomas made several comments indicating that he felt Mr. Stanbro was able to perform light duty work.

On February 14, 2003, the same date that Dr. Thomas learned from Mr. Stanbro that he was no longer working, Dr. Thomas also wrote under the "PLAN" section of the Progress Note, "If the patient is unable to have a light duty job available, [and since he] is not able to return to his earlier job as maintenance worker because of the heavier duties [he] should be on some form of worker's compensation." (R. at 129.)

On March 17, 2003, Dr. Thomas stated, "At the present time Mr. Stanbro continues on light duty restrictions. At the present time, if there is no light duty available, he should be placed

16

on Worker's Compensation after his unemployment until there is some re-training and job placement." (R. at128.) On May 21, 2003, Dr. Thomas' recommendations include the following: "Suggest a period of disability and retraining at the sedentary or lighter level of work." (R. at 180.)

Dr. Thomas does not opine about Mr. Stanbro's potential to perform work for the next three office visits in June, August, and October of 2003. (R. at 177-179.) Then, on November 18, 2003, he stated that the "patient continues to consider some retraining at a lighter level of work. Suggest vocational assessment and retraining." (R. at 176.) Finally, on February 17, 2004, Dr. Thomas noted "Retraining at the lighter level of work is in process." (R. at 174.)

We note again that the ALJ did not rely on the above evidence in his decision. It is likely that he did not rely on this evidence because it is inconsistent and requires some unsupported inferential leaps before one can say for certain what Dr. Thomas meant. We know that despite his initial injury Mr. Stanbro continued to work, and that he continued to work at a lighter duty level when that became necessary. Thus, we know that Mr. Stanbro has a history of attempting to perform work despite his impairment. It is possible that in the months after he stopped working Mr. Stanbro continued to express his desire to work to Dr. Thomas, and Dr. Thomas reflected that in his progress notes. It is also possible that Dr. Thomas believed that Mr. Stanbro met the social security definition for being qualified to perform light duty work. However, there is no record evidence showing that Dr. Thomas specifically evaluated or assessed Mr. Stanbro in order to determine his ability to work. There is no indication that the state agency asked Dr. Thomas to complete any form or to otherwise indicate exactly what limitations Mr. Stanbro has.

Even assuming that Dr. Thomas actually meant that Mr. Stanbro was capable of performing light duty work, there was no discussion by the ALJ or the Commissioner to explain why Dr. Thomas' opinion is worthy of credit over the conflicting opinion of Dr. Hope. This is especially critical in a case where the consulting examiner, Dr. Hope, actually evaluated Mr. Stanbro in order to determine his limitations. In contrast, Dr. Thomas' medical evidence consists of one page progress notes that are focused primarily on performing epidural injections

17

to provide short term relief from pain. In other words, Dr. Thomas' medical records contain very little evidence to support a conclusion that Mr. Stanbro is capable of light duty work, simply because the records are almost exclusively concerned with performing that day's epidural injection. In light of what this evidence shows, it is not surprising that the ALJ did not rely on it in his opinion.

## 5. Conclusion

In summary we have an extremely brief opinion with minimal citation to record evidence and practically no explanations offered to support the ALJ's decision. The ALJ appears to accept all of the medical evidence, except the state agency physician's ultimate opinion of Mr. Stanbro's limitations. However he fails to point to substantial evidence that is inconsistent with or contradicts Dr. Hope's opinion. A report based on a physical examination of a claimant by a state agency physician that shows that the claimant suffers from limitations suggesting an inability to work must be properly and thoroughly addressed by an ALJ. Other than sporadic comments by Dr. Thomas reporting on Mr. Stanbro's subjective complaints of pains, the ALJ did not point to any medical evidence from the Hospital, Dr. Thomas' Progress Notes, or the laboratory reports that contradicts Dr. Hope's opinion. These medical records are not in conflict regarding the fact that Mr. Stanbro suffers from degenerative disc problems. Thus, there is no explanation offered to show how Dr. Hope's opinion was inconsistent with and contradicted by other evidence.

The ALJ discounts Mr. Stanbro's testimony regarding the extent of his limitations, but Mr. Stanbro does not challenge this finding and it plays no part in determining whether the record evidence supports Mr. Stanbro's limitations as reported by Dr. Hope. Finally, a review of the relevant evidence relating to Mr. Stanbro's activities does not show that he is performing a wide range of activities. We therefore conclude that the ALJ's decision is not supported by substantial evidence.

18

**B. Residual Functional Capacity Determination**

The ALJ must consider all relevant evidence when determining an individual's residual functional capacity in step four. Fargnoli, 247 F.3d at 40 (citing 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a), 404.1546); Burnett v. Commissioner, 220 F.3d 112, 121 (3d Cir.2000). That evidence includes medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others. Fargnoli, 247 F.3d at 40 (citing 20 C.F.R. § 404.1545(a)).

The ALJ found that Mr. Stanbro retains the residual functional capacity for sedentary work that affords a sit/stand option, does not require repetitive use of foot controls, and does not require bending at the waist to 90 degrees. (R. at 25.)  The ALJ also found that given his residual functional capacity that there are a significant number of sedentary jobs with the above limitations in the national economy that Mr. Stanbro could perform, such as an assembler, lamp shade assembler, or surveillance systems monitor  (R. at 25.)

The ALJ first asked the vocational expert if it was correct that if Mr. Stanbro was limited to sedentary work he would be precluded from performing his previous work, and the expert agreed that Mr. Stanbro would not be able to perform his past work. (R. at 204.) Next, the ALJ asked the vocational expert if there would be any jobs a person could perform who fit Mr. Stanbro's profile and was "limited to sedentary work, would require a sit/stand option and would not be able to engage in repetitive use of foot controls." (R. at 204.) The vocational expert answered that there would be jobs such as a small products assembler, a lamp shade assembler, and monitor in surveillance. (R. at 204-205.) The vocational expert confirmed to the ALJ that such a person could still perform this work even if he was also limited to work that would not require bending at the waist to 90 degrees. (R. at 205.) Although this is ultimately the residual functional capacity the ALJ found that applied to Mr. Stanbro, the ALJ also asked the vocational expert as follows:

Q. All right. If I would hypothesize that we have an individual that would be unable to report to work or after having reported [to] work would have to (INAUDIBLE) himself from the work place on an irregular or random basis three

19

or more times per month because of pain. Would such an individual be able to perform any of the jobs you described?

A. Such an individual could not.

Q. If we have an individual that because of his pain would be inattentive or off task for 20 percent of the work day to exclude the usual work breaks and lunch period, would such an individual be able to do any of the jobs that you described.?

A. Such an individual could not, Your Honor.

(R. at 205.)

Mr. Stanbro's position is that the ALJ ignored or failed to consider his limitations as

supported by the medical evidence from his treating doctor and the evaluating doctor. He thus

argues that the hypothetical posed to the vocational expert by the ALJ is not supported by

substantial evidence because it is not supported by medical evidence of record and it fails to

accurately reflect Mr. Stanbro's impairments. Following the ALJ's examination, counsel for Mr.

Stanbro questioned the vocational expert with a hypothetical that included the limitations set

forth by Dr. Hope as follows:

Q. If an individual could only occasionally lift two to three pounds, 10 pounds or 20 pounds, through out an eight hour work day. if they could stand and walk one to two hours out of an eight hour work day, have a sit/stand option, they could never engage in postural activities, bending, kneeling, stooping, crouching, balancing or climbing. Would that individual be able to sustain competitive employment at the sedentary level?

A. Such an individual could not.

(R. at 205-206.)

In light of our review of the medical evidence we conclude that the ALJ did not

thoroughly evaluate and weigh the medical evidence. The ALJ's residual functional capacity

determination fails to account for Dr. Hope's limitations and there was not substantial evidence

in the record that was inconsistent with or contradicted Dr. Hope's opinion. We therefore

conclude that the vocational expert's assessment of Mr. Stanbro's ability to perform work was

based on a flawed hypothetical because it failed to account for his limitations as set forth by

Dr. Hope.

20

The United States Court of Appeals for the Third Circuit instructs that a

> vocational expert's testimony concerning a claimant's ability to perform
> alternative employment may only be considered for purposes of determining
> disability if the question accurately portrays the claimant's individual physical and
> mental impairments. A hypothetical question posed to a vocational expert must
> reflect all of a claimant's impairments.

Burns, 312 F.3d at 123 (citations omitted); see also Chrupcala v. Heckler, 829 F.2d 1269, 1276

(3d Cir. 1987); Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). Counsel for

Mr. Stanbro posed a hypothetical to the vocational expert that did include the limitations set

forth by Dr. Hope. In response, the vocational expert testified that Mr. Stanbro would be unable

to work. (R. at 205-206.) Accordingly, we will find that Mr. Stanbro is disabled.

## C. Substantial Evidence

"Despite the deference due to administrative decisions in disability benefit cases,

'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if

the [Commissioner]'s decision is not supported by substantial evidence.' " Morales v. Apfel, 225

F.3d 310, 317 (3d Cir.2000) (quoting Smith, 637 F.2d at 970).

Reviewing the supporting evidence and the ALJ's reasoning and review of the evidence

as it underlies the ALJ's opinion, we find that the ALJ's rejection of the state agency physician's

opinion is not supported by substantial evidence. The body of the ALJ's opinion contains only

one reference to potentially contradictory evidence, but that evidence was not substantial. In

contrast, the remainder of the objective medical evidence that was not rejected by the ALJ does

not contradict, and even supports, Dr. Hope's opinion.

With regard to determining Mr. Stanbro's residual functional capacity the ALJ did not

consider "all relevant evidence." Fargnoli, 247 F.3d at 40 (citing 20 C.F.R. §§ 404.1527(e)(2),

404.1545(a), 404.1546); Burnett, 220 F.3d at 121). The ALJ failed to account for the limitations

as set forth by Dr. Hope, which was not inconsistent with or contradicted by other substantial

evidence. Thus, we conclude that the ALJ's residual functional capacity determination is in

error as it is not supported by substantial evidence.

21

For similar reasons, and for the reasons set forth in our analysis, we also conclude that the ALJ erred in disregarding Mr. Stanbro's counsel's hypothetical question with the limitations as set forth by Dr. Hope. In response to this hypothetical, the vocational expert responded that Mr. Stanbro would not be able to sustain competitive employment at the sedentary level. Given our evaluation of the evidence, our findings and conclusions, we therefore adopt the vocational expert's response that Mr. Stanbro is not able to be employed and thus not able to perform substantial gainful activity. Therefore, we find that he is disabled. Accordingly, we will reverse the decision of the Commissioner and remand for an award of benefits.

## VI. Conclusion

For the foregoing reasons, we conclude that there is not substantial evidence existing in the record to support the Commissioner's decision that Plaintiff is not disabled, and therefore, the Defendant's motion for summary judgment is denied. In addition, for the above stated reasons, the decision of the Commissioner denying Plaintiff's claim for disability insurance benefits and supplemental security income must be reversed. This matter is remanded to the Commissioner for insurance benefits to be calculated and awarded to Plaintiff.

An appropriate order will be entered.

March 27, 2007
Date

Maurice B. Cohill,
Hon. Maurice B. Cohill, Jr.
Senior United States District Court Judge

cc:    counsel of record

22